Filed 11/29/21  Snoeck v. Exaktime Innovations CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| STEVE SNOECK, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> EXAKTIME INNOVATIONS, INC., <br><br> Defendant and Appellant. | B302178 <br><br> Los Angeles County <br> Super. Ct. No. BC708964 |
| STEVE SNOECK, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> EXAKTIME INNOVATIONS, INC., <br><br> Defendant and Respondent. | B304054 <br><br> Los Angeles County <br> Super. Ct. No. BC708964 <br><br> ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed on October 29, 2021, be modified as follows:

On page 56, in the last sentence of the first full paragraph, delete the word "infinite" and insert the word "indefinite" in its place.

Appellant and Cross-Respondent's petition for rehearing, filed on November 16, 2021, is denied.

There is no change in the judgment.

_____

EGERTON, J.               EDMON, P. J.                    HILL, J.*

---

\*      Judge of the Santa Barbara County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 10/29/21  Snoeck v. Exaktime Innovations CA2/3 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| STEVE SNOECK,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>EXAKTIME INNOVATIONS, INC.,<br><br>    Defendant and Appellant. | B302178<br><br>Los Angeles County<br>Super. Ct. No. BC708964 |
| STEVE SNOECK,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>EXAKTIME INNOVATIONS, INC.,<br><br>    Defendant and Respondent. | B304054<br><br>Los Angeles County<br>Super. Ct. No. BC708964 |

APPEALS from orders and a judgment of the Superior Court of Los Angeles County, Michael P. Linfield, Judge. Affirmed in part; reversed in part with directions; dismissed in part.

Barritt Smith Miner, Perry G. Smith, Paul B. Miner and Danielle N. Riddles for Plaintiff and Appellant.

Jackson Lewis, Michael A. Hood, Dylan B. Carp, Theresa M. Marchlewski and Jason M. Yang for Defendant, Appellant and Respondent.

———————————

Steve Snoeck sued his employer ExakTime Innovations, Inc. (ExakTime) under the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.)[1] for disability discrimination and related causes of action after it discharged him while he was on a medical leave of absence. A jury returned a verdict in favor of ExakTime on five of Snoeck's six causes of action; it found in favor of Snoeck on his claim ExakTime failed to engage in the interactive process. The trial court denied Snoeck's motions for judgment notwithstanding the verdict (JNOV) and for a new trial. Snoeck appeals from the judgment and orders; ExakTime conditionally cross-appeals from the judgment.

Snoeck argues (1) the defense verdict is not supported by substantial evidence; (2) the trial court committed structural error by excluding evidence of ExakTime's financial condition and limiting the time the parties had to present evidence; and (3) the court made prejudicial instructional and evidentiary errors. We find no prejudicial error and affirm. As a result, we do not reach ExakTime's cross-appeal and dismiss it.

---

[1] Statutory references are to the Government Code unless otherwise stated.

Snoeck also appeals from the order granting ExakTime's motion to tax Snoeck's costs by the amount he incurred after ExakTime served an offer to compromise under Code of Civil Procedure section 998 (section 998) that was greater than the amount the jury awarded him. Snoeck argues the section 998 offer was invalid, and the court abused its discretion in permitting ExakTime to submit evidence of the offer in its reply. We conclude the court abused its discretion and reverse the order.

## FACTS AND PROCEDURAL BACKGROUND[2]

### 1. *Snoeck's employment with ExakTime*

ExakTime sells time and attendance software for construction and field service companies. John O'Hara, ExakTime's President and then Chief Financial Officer, hired Snoeck.[3] Snoeck began work in April 2015 as an account executive for the small business segment of ExakTime's new sales group. As an account executive or "sales rep," Snoeck was responsible for getting new business by following up on inbound leads.[4] Snoeck had the east territory, starting work at 6:00 a.m.

---

[2] We summarize the evidence at trial in the light most favorable to ExakTime. (See, e.g., *Whiteley v. Philip Morris, Inc.* (2004) 117 Cal.App.4th 635, 642, fn. 3.) We discuss additional facts and procedural history relevant to Snoeck's contentions in the discussion sections of this opinion

[3] O'Hara became the Chief Executive Officer in January 2018.

[4] Leads—inquiries from potential customers about ExakTime's software—came mostly through ExakTime's website

3

Snoeck's most recent performance review was from January 2017.  His then-supervisor Karen Kennedy assessed Snoeck as a "great team member."  She rated him as "exceeds expectations" in attendance and punctuality, noting he worked "in the most challenging time zone"; "needs improvement" on his annual sales goal; and "meets expectations" in all other categories.

Michael Dickran became Snoeck's sales manager around May 2017.  Before his promotion, Dickran worked alongside Snoeck.  Dickran thought Snoeck was a good salesperson and had a "likeable disposition."

## 2.   *Snoeck's pre-2017 sleep apnea diagnosis*

Snoeck was first diagnosed with sleep apnea in 2010 after a sleep study.  He has had panic attacks since his youth.  In 2014, Snoeck was prescribed a CPAP[5] to wear at night to control his sleep apnea.  He did not wear the mask regularly because he didn't like it.[6]

Dr. Downs was Snoeck's primary care physician.  His notes from a November 2014 visit reflect Snoeck's "active problems" were morbid obesity, fatigue and insomnia, obstructive sleep

---

(those were automatically directed to the appropriate sales rep) and "live" phone calls.

[5]    A CPAP or BiPAP is a machine with tubes connected to a mask to provide the wearer with pressurized air during sleep. Snoeck used both.

[6]    Snoeck testified his panic disorder affected his ability to wear the sleep mask—he felt like he was suffocating.  He put his BiPAP mask on for the jury and explained how it worked.

4

apnea, shortness of breath, panic disorder, and thyroid disorder. He noted Snoeck had trouble using his mask and woke up short of breath at night.

In 2015, after another sleep study, Snoeck again was prescribed a sleep mask. He did not use that one regularly either. Snoeck had two more sleep studies in January and December 2016. The January study revealed he had severe obstructive sleep apnea. The recommendations following both studies noted weight loss would help "in at least reducing" and "possibly reducing," respectively, the severity of Snoeck's sleep apnea. When Snoeck saw Downs for a physical in October 2016, he was still having trouble with his CPAP.

### 3. *Snoeck sleeps on the job*

Snoeck began falling asleep at work around December 2016. O'Hara described Snoeck as sleeping for "short bursts"— lasting about five to eight minutes—several times a day, "pretty much every day." O'Hara estimated seeing Snoeck asleep "dozens of times" between December and May. "Just about every time I walked by his cube, he was asleep. [¶] . . . It was all the time." Dickran also saw Snoeck falling asleep "all over the place" during working hours, including during weekly sales meetings and at different times of day.

Around May 2017, Dickran noticed Snoeck's sleeping was getting increasingly worse. He, O'Hara, Karen Williams, ExakTime's Director of Finance and Human Resources, and other employees all heard Snoeck snoring. O'Hara said Snoeck's snoring and waking up with a "sudden snore or start" disturbed associates on the sales floor. Employees complained about Snoeck sleeping during work hours, asked "what was going on"

5

with him, found his snoring and sudden waking unsettling, and were having to monitor Snoeck to wake him up if he fell asleep.

Kennedy testified that, in spring 2017, Snoeck came to work injured. He told her he had blacked out in the shower and fallen, and he also had blacked out while driving with his family. (Snoeck testified he had fallen asleep during both incidents.) Kennedy told O'Hara Snoeck fell in the shower because she needed O'Hara's approval to get Snoeck a stand-up desk for his injury.

On May 25, 2017, around 10:00 a.m., Dickran and another sales rep had the following instant message exchange (lack of punctuation and capitalization in original):

> Dickran: "hey is Steve making any calls? [¶] I haven't heard him one bit"
>
> Sales rep: "no man. he sleeps lol [¶] . . . he is snoring right now at this moment lol"
>
> Dickran: "take a picture"

The exchange resumed around 1:30 p.m.:

> Sales rep: "you still want a picture or did you wake him up when you knocked on his glass lol"
>
> Dickran: "I woke him up [¶] he has a medical issue [¶] so it's not just he's 'tired' [¶] Steve is so large now his brain isn't getti[ng] enough oxygen and he falls asleep"
>
> Sales rep: "i know. I get it. im not trying to get him in trouble or anything. honestly, thats not my job. I just

6

                        want him to do something about it
                        to help himself. he eats out for
                        every single meal. im afraid
                        something is going to happen
                        to him one day you know?"
        Sales rep:      "oh I do [¶] I'm going to talk
                        with him about the weight [¶] he
                        seriously is on target to die young
                        [¶] and he would leave behind
                        two young sons [¶] if you see him
                        dosing off, be a friend and knock
                        on the glass or say his name"
        Sales rep:      "okay i will"

Dickran testified he was trying "to be . . . nice with [Snoeck]"—he needed him to make his calls, so he asked the sales rep to wake him. He also was concerned about Snoeck's weight; he knew being overweight "tends to lead to a lot of health issues."

O'Hara gave Snoeck two verbal warnings about sleeping—in February and April 2017. He called Snoeck into his office and told him falling asleep on the job was unacceptable, and also was " 'disturbing your fellow sales reps around you.' " O'Hara testified Snoeck replied he was having trouble sleeping at night, but he never mentioned sleep apnea or problems with a mask he had to wear. As his manager, Dickran also told Snoeck he couldn't be falling asleep.

4.      *Decision to offer Snoeck a leave of absence*

O'Hara again saw Snoeck sleeping on the job a day or two before June 1, 2017; he decided to fire him. O'Hara testified, "[I]t was to the point now he was disrupting the sales floor,

7

his performance was suffering and I was getting ready to terminate him." O'Hara said the option to terminate Snoeck for sleeping on the job was "always on the table," but he "always cut him a break."

On June 1, 2017 (or possibly May 31), after meeting with Dickran and Williams, O'Hara decided to offer Snoeck a 60-day personal leave to get his sleep issue under control. ExakTime's normal leave policy is 10 days. Snoeck was called into the meeting. O'Hara testified he told Snoeck, " 'Steve, we've talked to you many times about your sleeping. It's out of control. You've got to get it under control or else I have to terminate you.' "[7] Snoeck again replied he was " 'just not sleeping well at night.' " They then offered Snoeck the opportunity to take the 60-day personal leave. Dickran said Snoeck was "very grateful for being given the time to go deal with it rather than being let go." Snoeck wanted to speak to his wife before deciding. After calling his wife, Snoeck told Williams (and, at some point, O'Hara) he would take the leave.

Williams testified Snoeck then asked for information on state disability insurance (SDI). She emailed him the link to the California state disability website.[8] At that point, she did not know if he had a disabling condition—if an employee asks for disability insurance information, she sends it without asking questions.

---

[7]    Dickran similarly testified they told Snoeck, "[W]e could let you go, but we don't want to. We want you to take care of the problem."

[8]    Williams sent the email on June 1, 2017, at 11:27 a.m.

8

## 5. *Snoeck's leave*

After Snoeck accepted the leave, he also asked Williams to send him forms to apply for Family and Medical Leave Act (FMLA) leave. She sent Snoeck an FMLA notice of eligibility—stating he had informed ExakTime of his need for leave for his "own serious health condition" on June 2, 2017—and a form specifying his essential job functions as "Inside Sales, Computer, Telephone," to be filled out by his doctor. She told Snoeck the FMLA gave him up to 12 weeks of protected leave.

Downs completed the FMLA certification for Snoeck. He described Snoeck's "condition" as "uncontrolled," and stated he was "unable to function until stabilized." He certified Snoeck was unable to perform any of his job functions and estimated he would be incapacitated from June 3 to October 1, 2017. On July 3, 2017, Downs also wrote Snoeck a note retroactively placing him "off work due to illness 6-3-17 through 10-31-17."[9]

Before he saw Downs, Snoeck went to his pulmonologist-sleep doctor, Dr. Prisco, on June 12, 2017. Prisco's notes reflect Snoeck reported he was struggling with sleeping with his BiPAP, had fatigue during the day, and had met with a bariatric surgeon—he was considering surgery for weight loss. Prisco ordered a sleep test to determine the optimal pressure settings for Snoeck's BiPAP. Snoeck had the test on June 28 and his BiPAP settings were changed.

On July 8, 2017, during a brief conversation at a company party, Snoeck told O'Hara he was doing better, his sleep had

---

[9] Downs did not provide a specific diagnosis to avoid violating patient privacy laws.

9

improved, and he was losing weight and planning to have bariatric surgery. Snoeck also had a five-minute phone call with O'Hara on July 27 to tell O'Hara his surgery was scheduled for mid-November. Snoeck testified he asked O'Hara if he wanted him to return to work on October 31 and go on leave again for his surgery, or " 'how do you want me to do it?' " Snoeck said O'Hara told him, " 'Do what you feel.' " Snoeck testified his doctor recommended he wait to return to work until January 1.

Snoeck updated the company on August 4, 2017, in an email to Dickran, copied to Williams. Snoeck wrote,

> "I met with the [bariatric surgeon] and dieti[c]ian at UCLA today. Things are progressing nicely. I have lost 16 lbs. so far and on pace to drop another 20 by my surgery in Dec. [¶] I wanted to come back to work the 1st week of [S]ept. However my primary Dr[.] wants me to follow his orders of 1st week in Oct. Other than that I'm feeling better, my sleep has improved now that I have the right settings on my bi-pap machine, but still kinda hard wearing a mask to bed."

Dickran replied, "Very exciting about getting your health turned around. Proud of you and your family. Keep me in the loop and let me know if you need anything."

6. ***ExakTime's coverage of Snoeck's leads***

Snoeck's leads were reassigned to other sales reps when he went on leave—both within the small business unit and to reps in other units. Due to the high volume of leads, however, the two remaining small business sales reps could not handle their own leads and those from Snoeck's territory. Dickran

10

realigned Snoeck's territory on August 7, 2017, and divided his leads among sales reps who worked in other units. ExakTime also moved another problematic employee to small business temporarily to "plug the gap."

ExakTime hired a new sales executive on August 28, 2017. That hire was part of its plan—from before Snoeck went on leave—to increase the small business segment from three to four sales executives. Snoeck's job remained open to him.

### 7. *Snoeck's request for an extended leave, and ExakTime's decision to discharge him*

On September 11, in an email to Dickran and Williams, Snoeck asked to extend his leave through January 1, 2018. He wrote:

> "The last few months have been extremely tough, mentally and physically but I do see the light at the end of the tunnel. [¶] Slow and steady I've been losing weight so far, about 25 lbs., I have way more energy, and been getting at least 5-6 hours of sleep a night. Which is a great improvement from 2-3 hours. But still [a] ways to go. [¶] My Bariatric surgery is scheduled Mid Nov. I know originally the doctor had me off of work until Oct. 1st. After Speaking with Primary Physician and Surgeon, they want me to continue to focus on my current program and extend[] out disability 6 weeks after the Surgery, which puts me back to work beginning of January. I know it was longer than expected[,] however, this will give me

11

the time needed to make a complete successful lifestyle change. [¶] My family and I appreciate all of you at Exak[T]ime for giving me the opportunity to make this lifestyle change to get healthy. . . ."

The email attached a note from Downs stating Snoeck was "off work due to illness through 1-1-18." Dickran forwarded the email to O'Hara, who was on vacation.

When O'Hara returned on September 18, Dickran told him he couldn't meet his sales quota unless he filled Snoeck's seat. He told O'Hara "they [small business] were down a man and I just can't wait for him to come back." The new sales executive who began at the end of August was not "fully ramped" —it would take him 90 days to be fully trained—and the employee borrowed from another unit had to be moved back or terminated for nonperformance. O'Hara explained, "Because of the rapid escalation of leads in the small business market, we needed four solid people there."

O'Hara made the final decision to terminate Snoeck's employment. He testified he had assumed Snoeck was coming back on October 31, 2017, and "that was perfectly acceptable." But, O'Hara did not want to extend Snoeck's leave until January because he wasn't certain Snoeck would come back then, and he needed to fill his position.

O'Hara said he didn't "feel [Snoeck] was taking the steps necessary to even get the surgery in November [or] December." O'Hara didn't see "any action on [Snoeck's] part to get well,

12

to lose significant weight in order to get that surgery."[10] O'Hara responded "yes" to the question, "[Y]ou equated getting well with losing weight, right?" O'Hara said, "It was my own assumption at the time that the chances of him coming back were slim, by January 1st. . . . Right or wrong, I made that assumption."

But O'Hara based his belief that the surgery would help Snoeck's sleeping issue on what Snoeck had told him. When asked if he thought surgery was what Snoeck needed to overcome his sleeping issue, O'Hara responded, "He told me that, yes." O'Hara was concerned Snoeck would continue to have an issue with sleeping on the job because he "didn't see anything that's going to change that going forward." He also wasn't certain when Snoeck's "lifestyle change would be complete" or what that meant. Snoeck had never said he planned to use his leave "to make a lifestyle change."

O'Hara testified ExakTime was losing sales due to leads "not being properly worked." He estimated ExakTime lost $30,000 in potential sales each month while Snoeck was on leave but admitted he could not identify a lost sale specifically due to Snoeck's leave. O'Hara testified there were too many leads to look at—about 1,800—to conduct a lead-by-lead analysis. He could identify, however, a reduced "close ratio"—meaning the ratio of leads that resulted in new business—due to the reduced staffing.

O'Hara "gave the approval" to discharge Snoeck and asked Williams to tell Snoeck to call and reapply when he was able to

---

[10]     Based on his limited research, O'Hara believed Snoeck had to lose 50 to 75 pounds to be eligible for the bariatric surgery.

13

return to work.  On September 19, 2017, Williams called Snoeck and terminated his employment; she told him they needed to fill his position.  She also told him to let them know when he was released by his doctor and ready to come back to work, and they would "see if there was a position available and consider bringing him back on."  Snoeck never reapplied to work at ExakTime.  And, although they had job openings in January, no one at ExakTime contacted Snoeck.  ExakTime hired Snoeck's replacement in October 2017.

### 8.    *Snoeck's sleep apnea post-termination*

In October 2017, Snoeck again fell asleep while standing up.  He broke his leg, injured his ankle, and had to have surgery.  At the time, he still was not using his sleep mask "the whole night through" because it was uncomfortable.  On December 5, 2017, Snoeck's doctor wrote him "off work due to illness" through March 31, 2018.  He did not have the surgery in November because he had to heal from his leg first.

In April 2018, Snoeck got his sleep apnea under control when he began to use his BiPAP mask regularly.[11]

---

[11]    Prisco's notes from Snoeck's February 5, 2018 visit note he reported he was not having surgery, was getting five hours of sleep nightly, was no longer falling asleep standing or driving, and had "improvement in fatigue since using his bipap."  At his October 30, 2018 visit, Snoeck reported he was using his BiPAP nightly to get about seven hours of sleep and was not fatigued during the day.  He also said he was back in bariatric surgery class and considering surgery in the future.

14

**9.**     *The complaint, trial, and post-trial proceedings*

On June 6, 2018, Snoeck sued ExakTime under FEHA for failure to reasonably accommodate a known or perceived disability (§ 12940, subd. (m)(1)), failure to engage in the interactive process (*id.*, subd. (n)), disability discrimination (*id.*, subd. (a)), failure to prevent discrimination and retaliation (*id.*, subd. (k)), and retaliation (*id.*, subd. (m)(2)); and for wrongful termination in violation of public policy. Snoeck alleged he suffers from sleep apnea, high blood pressure, and hypothyroidism. The complaint does not mention Snoeck's obesity.

Snoeck's case was tried before a jury over five days. On June 25, 2019, the jury returned a verdict in favor of ExakTime on all Snoeck's causes of action except the failure to engage in the interactive process.[12] On that cause of action, the jury awarded Snoeck $58,088 in economic damages and $72,000 in noneconomic damages, totaling $130,088. The jury found ExakTime did not act with malice, oppression, or fraud.

Snoeck moved for JNOV and for a new trial, based on insufficiency of the evidence and instructional and evidentiary errors. The court heard and denied those motions and entered judgment based on the verdict on October 29, 2019. Snoeck timely appealed, and ExakTime conditionally cross-appealed.

_____

[12]     The jury voted in favor of ExakTime 11 to one on the discrimination claim and 10 to two on the failure to accommodate claim. The verdict was unanimous on the retaliation, failure to prevent discrimination and/or retaliation, and wrongful termination claims. The jury found in favor of Snoeck on the interactive process claim 11 to one, and 10 to two on his damages.

On November 13, 2019, Snoeck filed a memorandum of costs totaling $91,175.59. ExakTime moved to tax costs based on Snoeck's rejection of its pretrial offer to compromise under section 998, among other grounds. The trial court granted that portion of ExakTime's motion on January 21, 2020. It taxed costs by $30,056.44, and awarded Snoeck $49,353.46 in costs. Snoeck appealed.

We consolidated the two appeals for argument and decision.

## DISCUSSION

### Appeals Relating to Verdict

Snoeck contends: (1) the "uncontradicted and unimpeached evidence . . . leaves no room" for a reasonable jury—had it been properly instructed—"to find against Snoeck on any of his claims"; (2) the trial court committed structural error by precluding him from presenting evidence necessary to rebut ExakTime's undue hardship affirmative defense—ExakTime's 2017 financial condition—and by limiting his trial time to 6.5 hours (extended to 7.5 hours); (3) the court made nine prejudicial instructional errors; and (4) the court made four prejudicial evidentiary rulings.

### 1. *FEHA's protections of employees with actual or perceived disabilities*

FEHA prohibits several employment practices against individuals who have physical disabilities.[13] (*Nealy v. City of*

---

[13] FEHA was modeled on the Americans with Disabilities Act (ADA); California courts deciding FEHA cases look to federal cases interpreting the ADA. (*Prilliman v. United Air Lines, Inc.* (1997) 53 Cal.App.4th 935, 948 (*Prilliman*).)

*Santa Monica* (2015) 234 Cal.App.4th 359, 371.)  Employers may not:  discharge or take other adverse employment actions against employees "because of" their disabilities (§ 12940, subd. (a)); "fail to make reasonable accommodation for the known" disabilities of employees (*id.*, subd. (m)(1)); "fail to engage in a timely, good faith, interactive process" with employees to determine effective reasonable accommodations (*id.*, subd. (n)); retaliate against employees for engaging in activity protected by FEHA—here, requesting or taking a leave of absence as an accommodation (*id.*, subds. (h), (m)(2)); or fail to take reasonable steps to prevent discrimination or retaliation (*id.*, subd. (k)).  Each of these unlawful employment practices constitutes a separate cause of action.  (*Nealy*, at p. 371.)

A disabled plaintiff need not show the employer " 'had it in for him,' " or harbored ill will against him or other similarly disabled employees, to demonstrate discriminatory motive.  (*Gelfo v. Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34, 54, fn. 14.)  Rather, an employer discriminates against an employee because of his disability "when the disability is a substantial motivating reason for the employer's decision to subject the employee to an adverse employment action."  (*Wallace v. County of Stanislaus* (2016) 245 Cal.App.4th 109, 128 (*Wallace*).)

"Although section 12940 proscribes discrimination on the basis of an employee's disability, it specifically limits the reach of that proscription, excluding from coverage those persons who are not qualified, even with reasonable accommodation, to perform essential job duties."  (*Green v. State of California* (2007) 42 Cal.4th 254, 262 (*Green*).)  Thus, FEHA does not prohibit an employer from discharging an employee "if the employee, because of a physical . . . disability, is unable to perform the employee's

17

essential duties even with reasonable accommodations." (§ 12940, subd. (a)(1).) The employee bears the burden of proving he can perform the essential duties of the job with or without reasonable accommodation. (*Green*, at p. 260.)

Accordingly, "drawing distinctions" based on an employee's physical disability "is not forbidden discrimination *in itself*. Rather, drawing these distinctions is prohibited *only if* the adverse employment action occurs because of a disability *and* the disability would not prevent the employee from performing the essential duties of the job, at least not with reasonable accommodation." (*Green, supra*, 42 Cal.4th at p. 262.) Nor must an employer provide an accommodation that the employer demonstrates will "produce undue hardship"—meaning "significant difficulty or expense" considering several factors— "to its operation." (§ 12940, subd. (m)(1); § 12926, subd. (u).)

In other words, the statute recognizes an employer has a legitimate reason to take an adverse action against an employee because of the employee's physical condition if the employee cannot perform essential job duties even with a reasonable accommodation, and a legitimate reason for not providing an accommodation if doing so would result in an undue hardship to its business. (See *Wallace, supra*, 245 Cal.App.4th at pp. 126–127.) Nevertheless, an employer is subject to FEHA liability for taking an adverse action against a disabled employee whom the employer mistakenly believes is unable to perform his essential job functions even with a reasonable accommodation. (*Id.* at p. 115 [employer, not the employee, must bear the financial consequence of employer's mistake about employee's physical condition].)

## 2.    *Snoeck's claimed disabilities*

FEHA defines "physical disability" as a physical condition that affects a body system and limits a major life activity,[14] as well as "[b]eing regarded or treated by the employer . . . as having, or having had, any physical condition that makes achievement of a major life activity difficult." (§ 12926, subd. (m)(1), (4).)

Snoeck's complaint alleged he suffered from sleep apnea, high blood pressure, and hypothyroidism.  At trial, Snoeck admitted he controlled his blood pressure and hypothyroidism with medication—they did not hamper his ability to work. Snoeck agreed falling asleep was the only issue he was having at work.  Accordingly, of his three alleged physical conditions, only Snoeck's sleep apnea constitutes an actual physical disability for purposes of his FEHA claims.

Snoeck also was obese.  Obesity does not qualify as an "actual disability" under FEHA, however, because Snoeck presented no evidence that it had a physiological cause.  (*Cornell v. Berkeley Tennis Club* (2017) 18 Cal.App.5th 908, 928, 939 (*Cornell*).)  Nor did Snoeck allege his obesity was a disability. Instead, Snoeck's obesity may qualify as a *perceived* disability under FEHA if ExakTime regarded or treated his weight as " 'mak[ing] achievement of a major life activity difficult' "— here, breathing, sleeping, or working.  (*Cornell*, at p. 939; § 12926, subd. (m)(4), (5).)

---

[14]    Major life activities include "physical, mental, and social activities and working."  (§ 12926, subd. (m)(B)(iii).)  A physical condition limits a major life activity "if it makes the achievement of the major life activity difficult."  (*Id.*, subd. (m)(B)(ii).)

### 3. *Review of the verdict for substantial evidence*

Snoeck challenges both the judgment based on the sufficiency of the evidence, and the court's denial of his motion for JNOV.[15]

### a. *Standard of review*

Our review of Snoeck's appeal from the judgment and order denying JNOV requires us to determine whether substantial evidence supports the jury's verdict. (*Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1188 (*Wilson*) [substantial evidence standard of review]; *Hirst v. City of Oceanside* (2015) 236 Cal.App.4th 774, 782 [on review of denial of JNOV motion appellate court reviews the record de novo to determine independently whether there is any substantial evidence to support the verdict].) We consider the entire record to determine if there is any substantial evidence—contradicted or uncontradicted—that supports the jury's verdict. (*Wilson,* at p. 1188; *Collins v. County of San Diego* (2021) 60 Cal.App.5th 1035, 1048.) We view the evidence in the light most favorable to ExakTime, " 'giving it the benefit of every reasonable inference and resolving all conflicts in its favor.' " (*Wilson*, at p. 1188; see also *Collins*, at p. 1048.) "We do not reweigh evidence or reassess

---

[15]    ExakTime argues Snoeck did not state the facts in the light most favorable to the judgment and has forfeited the substantial evidence issue. (*Hartt v. County of Los Angeles* (2011) 197 Cal.App.4th 1391, 1402.) As Snoeck also asserts instructional errors that require us to view the evidence in the light most favorable to the claimed error, we decline to find he has forfeited the issue.

the credibility of witnesses. [Citation.] We are 'not a second trier of fact.'" (*Pope v. Babick* (2014) 229 Cal.App.4th 1238, 1246.)

Substantial evidence is evidence that is legally significant, reasonable, credible, and of solid value. (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.) "Inferences may constitute substantial evidence, but they must be the product of logic and reason. Speculation or conjecture alone is not substantial evidence." (*Ibid.*) "The testimony of a single witness may constitute substantial evidence," and we defer to the jury's implicit finding of credibility. (*Duchrow v. Forrest* (2013) 215 Cal.App.4th 1359, 1376–1377 (*Duchrow*).)

Moreover, a jury's general verdict "imports findings in favor of the prevailing party on all material issues." (*Wilson, supra,* 169 Cal.App.4th at p. 1193.) If the evidence supports implied findings on any set of issues that will sustain the verdict, we will assume the jury made those findings. (*Ibid.*) We need not speculate as to what particular ground the jury may have found in favor of the prevailing party. (*Ibid.*)

And, "[w]hen the trier of fact has expressly or implicitly concluded that the party with the burden of proof failed to carry that burden and that party appeals"—as here—we consider " 'whether the evidence compels a finding in favor of the appellant as a matter of law.'" (*Petitpas v. Ford Motor Co.* (2017) 13 Cal.App.5th 261, 302.) Specifically, we ask whether the appellant's evidence was " '(1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." ' " (*Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 466.)

21

Under this standard, "it is almost impossible" for a plaintiff "to prevail on appeal by arguing the evidence compels a judgment in his favor. That is because unless the [trier of fact] makes specific findings of fact in favor of the losing plaintiff, we presume the [trier of fact] found plaintiff's evidence lacks sufficient weight and credibility to carry the burden of proof." (*Bookout v. State of California ex rel. Dept. of Transportation* (2010) 186 Cal.App.4th 1478, 1486 (*Bookout*).)

  b. *Snoeck's burden of proof*

Snoeck argues (1) the evidence that ExakTime required him to take an unpaid leave of absence in June 2017 established his disability discrimination and failure to accommodate claims as a matter of law;[16] and (2) the evidence relating to his termination in September 2017 established all his claims as a matter of law.

The court instructed the jury with CACI Nos. 2540 and 2541 on Snoeck's disability discrimination and failure to accommodate claims, respectively. Snoeck does not contend these instructions were wrong.

To establish ExakTime "wrongfully discriminated against him based on his physical condition and/or what ExakTime perceived to be a disability," the trial court instructed the jury that Snoeck had to prove: (1) ExakTime knew he "had a physical condition that limited a major life activity or regarded or treated [him] as if he had[ ] a physical condition" that did; (2) he "was

---

[16] Snoeck also contends his claim for failure to engage in the interactive process was established as a matter of law. But, as the jury found in his favor on that claim, we need not consider whether substantial evidence supported that finding.

able, or would have been able, to perform the essential job duties with reasonable accommodation for his actual or perceived physical condition"; (3) ExakTime "discharged [him] or took other adverse employment action against him"; and (4) his "actual or perceived physical condition was a substantial motivating reason" for ExakTime's adverse employment decision. (See CACI No. 2540; *Nadaf-Rahrov v. Neiman Marcus Group, Inc.* (2008) 166 Cal.App.4th 952, 962 (*Nadaf-Rahrov*).)

At the parties' joint request, the court also instructed the jury that Snoeck need not "prove that [ExakTime] held any ill will or animosity toward him personally because he was or was perceived to be disabled."

For Snoeck's failure to accommodate claim, Snoeck similarly had to prove ExakTime knew he had—or treated him as having—a physical condition that limited a major life activity and that he was able to perform his essential job duties with a reasonable accommodation, as well that ExakTime failed to provide a reasonable accommodation for his actual or perceived disability. (See CACI No. 2541; *Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1009–1010 (*Scotch*).)

c.      *The evidence does not compel a finding that ExakTime violated FEHA when it put Snoeck on leave*

Snoeck contends the evidence compelled the jury to find ExakTime discriminated against him because of his actual or perceived disability and failed to accommodate his disability— or what it regarded as his disability—when it required him to take a leave of absence in June 2017. We disagree.

i. The jury reasonably could have found Snoeck failed to prove ExakTime's knowledge

First, the evidence does not compel a finding that, when ExakTime offered Snoeck a 60-day leave, it knew he had a physical disability, or regarded him as having one—a necessary element to both Snoeck's disability discrimination and failure to accommodate claims. (*Brundage v. Hahn* (1997) 57 Cal.App.4th 228, 236–237 ["a plaintiff must prove the employer had knowledge of the employee's disability when the adverse employment decision was made"].)

" '[A]n employer "knows an employee has a disability when the employee tells the employer about his condition, or when the employer otherwise becomes aware of the condition, such as through a third party or by observation. The employer need only know the underlying facts, not the legal significance of those facts." ' " (*Soria v. Univision Radio Los Angeles, Inc.* (2016) 5 Cal.App.5th 570, 592 (*Soria*).) While knowledge of an employee's disability " 'can be inferred from the circumstances, knowledge will only be imputed to the employer when the fact of disability is the only reasonable interpretation of the known facts. "Vague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations . . . ." ' " (*Ibid.*) Thus, "[t]he employee bears the burden of giving the employer notice of his or her disability." (*Avila v. Continental Airlines, Inc.* (2008) 165 Cal.App.4th 1237, 1252.)

The evidence showed O'Hara was the ExakTime employee who decided—after a conversation with Dickran and Williams—to offer Snoeck a 60-day leave to address his falling asleep at work. Based on the evidence, the jury reasonably could find

24

O'Hara did not know—nor could have only reasonably interpreted—Snoeck's sleeping on the job was due to a physical disability.

O'Hara testified that, as of the June 1, 2017 meeting, he "had no idea" Snoeck had "sleep apnea or any specific health condition" causing him to fall asleep at work, and knew nothing about Snoeck's CPAP machine. Williams and Dickran also denied knowing Snoeck had sleep apnea. Even at the meeting, when O'Hara told Snoeck he had to get his sleeping "under control or else [he'd] have to terminate" him, Snoeck replied only, "I'm just not sleeping well at night." O'Hara denied knowing at the time what was causing Snoeck to fall asleep and denied thinking Snoeck's weight was the cause.

Snoeck's testimony about what was said at the June 1 meeting conflicted. He also introduced evidence that his sleep apnea was a " 'known thing' " at work before June 1.

We will not reweigh the evidence—we presume the jury resolved the conflicts in the evidence in ExakTime's favor—and we defer to the jury's implicit finding that O'Hara and the others were credible. (*Duchrow, supra*, 215 Cal.App.4th at pp. 1376–1377.) O'Hara's and Williams' testimony was sufficient to support the jury finding ExakTime did not know Snoeck had a physical disability and did not treat him as having one when O'Hara offered him the opportunity to take leave.

Nor does O'Hara's, Williams', or Dickran's observation that Snoeck could not stay awake at work compel a finding that, as of June 1, 2017, they could have attributed Snoeck's sleeping only to a physical "disease, disorder, [or] condition." (§ 12926, subd. (m)(1) [defining physical disability].) As Williams said, she "obviously" knew "[s]omething was going on" with Snoeck—

25

because he was falling asleep at work—but she didn't know "what was happening with him, whether there was a personal issue going on" or something else.  Accepting the evidence favorable to ExakTime as true, O'Hara and Williams could have made any number of inferences as to the cause of Snoeck's sleeping other than a disability—stress, personal problems, a poor mattress, or even generally poor health.  This is especially true given the testimony that Snoeck told O'Hara only that he was having trouble sleeping and did not mention his sleep apnea diagnosis when offered the 60-day leave.

Snoeck refers to Dickran's May 25 message describing Snoeck as having a "medical issue," and implying Snoeck's weight was causing him to fall asleep, as evidence Dickran knew Snoeck had a disability, or regarded him as having one.  He contends that knowledge was imputed to ExakTime as a matter of law.[17]

But, O'Hara testified that, at their June 1 meeting, Dickran did not say anything to him about Snoeck seeing a sleep doctor, having a sleep study, or wearing a mask.  Williams testified similarly.  The jury reasonably could have found that, as of June 1, 2017, Dickran had not shared his personal belief about Snoeck's weight affecting his ability to stay awake with O'Hara or Williams, and that they did not have a similar perception.

---

[17]     Snoeck also cites as evidence of Dickran's knowledge ExakTime's admission—which was read to the jury—that, before May 31, 2017, Snoeck told Dickran " 'he was having trouble sleeping, was having a sleep test, was being fitted for a CPAP machine, had fallen asleep while standing and had fallen and injured his knee.' "

Nor is Dickran's purported knowledge imputed to ExakTime as a matter of law because he was Snoeck's supervisor. Snoeck relies on *California Fair Employment & Housing Com. v. Gemini Aluminum Corp.* (2004) 122 Cal.App.4th 1004, 1015 (*Gemini*). In *Gemini*, however, the employee—who was fired for taking unauthorized days off for religious reasons—specifically told his supervisor he was a Jehovah's Witness and needed time off to attend a religious convention. (*Id.* at pp. 1009–1010.) Despite having a "duty to communicate" the employee's requested accommodation to management (management also expected the employee to go through the supervisor), the supervisor failed to mention the employee wanted the days off for religious reasons until it was too late to grant the request. (*Id.* at p. 1015.) The court agreed the supervisor's knowledge that the employee needed a religious accommodation was imputed to the company. (*Ibid.*) In contrast, here there is no evidence Snoeck ever asked Dickran—or anyone else—for an accommodation for his sleeping issue; thus, no presumed duty on Dickran's part to convey a requested accommodation or existence of a purported disability arose. (*Id.* at p. 1016.)

Snoeck also asserts Williams knew he had a medical issue when ExakTime placed him on leave because she sent him the link for SDI. But, Williams testified Snoeck *asked her* for the SDI information *after* he had talked to his wife and agreed to take the leave of absence. Williams did not understand Snoeck to have a health condition until he returned the FMLA paperwork with his doctor's certification and note stating Snoeck could not work. Again, we will not resolve conflicting testimony. We presume the jury credited Williams' testimony.

27

Because the evidence did not compel the jury to find ExakTime knew Snoeck had a physical condition that limited a major life activity, or treated him as if he had one, as of June 1, 2017, that ExakTime put him on leave did not constitute either disability discrimination or a failure to accommodate under FEHA.

> ii. The jury reasonably could have found Snoeck failed to prove leave, at that point, was not a reasonable accommodation

Snoeck argues ExakTime could have accommodated him with part-time or remote work instead of an unpaid leave. As we stated, ExakTime was not obligated to accommodate Snoeck when it offered him a leave on June 1. Snoeck seems to contend ExakTime also should have made these other accommodations after his leave began. The court properly instructed the jury that, "[w]hen an employee can work with a reasonable accommodation other than a leave of absence, an employer may not require that the employee take a leave of absence. An employer, however, is not required to provide an indefinite leave of absence as a reasonable accommodation."

Snoeck's counsel elicited testimony that ExakTime never offered nor asked Snoeck about working part-time or remotely in lieu of taking leave. But there was no evidence Snoeck ever asked to do either. Although section 12940, subdivision (m) does not *require* an employee to "first come forward and request a specific accommodation before the employer has a duty to investigate such accommodation," " 'the employee can't expect the employer to read his mind and know he secretly wanted a particular accommodation and sue the employer for not providing it.' " (*Prilliman , supra*, 53 Cal.App.4th at p. 954.)

28

If Snoeck required a specific accommodation, he had to ask about it. (*Doe v. Department of Corrections & Rehabilitation* (2019) 43 Cal.App.5th 721, 738–739.) Nor did Snoeck present evidence he could have worked without falling asleep had he been given one of those options.

And, at the point ExakTime learned Snoeck's sleeping issue was the result of his claimed disability, the jury could have concluded a leave of absence was the only reasonable accommodation available. Snoeck's doctor certified him as unable to perform *any* of his essential job functions as of June 3, 2017, described his "condition" as "uncontrolled," and ordered him off work through October. Substantial evidence supported the jury finding ExakTime did reasonably accommodate Snoeck: It gave him a 60-day personal leave, which was longer than the 10-day leave it normally allowed; Snoeck's leave became a protected FMLA leave when his doctor certified him as incapacitated until October 2017; and, although Snoeck's FMLA leave would expire after August 25, ExakTime planned to allow him to remain on leave until October 31.

d. *The evidence does not compel a finding that ExakTime discriminated against or failed to accommodate Snoeck when it discharged him*

Snoeck had to prove he was able to perform the essential functions of his job with reasonable accommodation to establish his discharge constituted disability discrimination and/or a failure to accommodate. (*Green, supra*, 42 Cal.4th at pp. 254, 262; *Nadaf-Rahrov, supra*, 166 Cal.App.4th at p. 977 [employee bears burden of proving "ability to perform essential function of a job with accommodation"; employee "is in as good as a position as the employer to demonstrate he or she could perform the

29

essential functions of a job with accommodations"].) The trial court properly instructed the jury that "[r]easonable accommodations may include . . . [p]roviding additional leave of absence when leave of absence under the CFRA/FMLA has expired." Again, the court's instruction that an employer "is not required to provide an indefinite leave of absence as a reasonable accommodation" also was proper.

A "finite leave can be a reasonable accommodation under FEHA, provided it is likely that at the end of the leave, the employee would be able to perform his or her duties." (*Hansen v. Lucky Stores, Inc.* (1999) 74 Cal.App.4th 215, 226 (*Hansen*); see also *Jensen v. Wells Fargo Bank* (2000) 85 Cal.App.4th 245, 263 [leave a reasonable accommodation "where it appears likely that the employee will be able to return to an existing position at some time in the foreseeable future"].) Accordingly, Snoeck had to demonstrate a leave until January 2, 2018, was reasonable in that (1) it was likely he would be able to perform his job when he returned; and (2) the leave he requested was not indefinite.

      i.     The evidence supported the jury's implied finding Snoeck's sleeping prevented him from performing his essential job functions

First, the jury reasonably could have concluded Snoeck's sleeping prevented him from doing his job.[18] By all accounts,

_____

[18] Snoeck argues he was performing his job—despite sleeping—up until ExakTime put him on leave. True, Snoeck went to work and worked while he was awake, but plainly he could not perform any essential job function when he was asleep, and his sleeping on the job was getting worse.

Snoeck could not stay awake at work. ExakTime employees saw him asleep several times a day—to the point of snoring—throughout the day. Clearly, an employee must be awake to perform his job. O'Hara also testified Snoeck's "performance quota started to drop off in [the] April/May timeframe" due to his sleeping on the job.

Nevertheless, as he did at trial, Snoeck mischaracterizes O'Hara's testimony as showing Snoeck slept a total of only four or five minutes a day. At trial, O'Hara corrected Snoeck's counsel's mischaracterization: "It was longer than four minutes a day. It was several four-minute bursts of—so it wasn't just four minutes a day. [¶] Just about every time I walked by his cube, he was asleep. [¶] And I walked by maybe 4 or 5 times a day, at the most." Snoeck's counsel then described O'Hara's estimate of the number of times he saw Snoeck asleep as having gone from "12 to 700 [times]" based on his earlier testimony that he saw Snoeck sleeping about a dozen times. But, O'Hara responded that, while 700 times was an exaggeration, 12 times "was a significant understatement." He clarified, "It was dozens of times I saw him asleep."

We presume the jury considered and resolved any inconsistencies in O'Hara's testimony in ExakTime's favor. (*Minnegren v. Nozar* (2016) 4 Cal.App.5th 500, 513–514 (*Minnegren*) [substantial evidence test required court of appeal "to accept any portion" of a witness's testimony that supports the judgment].) Given that Snoeck's essential job functions required him to make and respond to sales calls throughout the day—and under some time pressure to ensure he met his quota—the jury reasonably could conclude his chronic sleeping interfered with his ability to perform those functions.

Snoeck cites *Overton v. Reilly* (7th Cir. 1992) 977 F.2d 1190, 1195 for the proposition that an employee whose "sleepiness is a function of his disability" must be permitted to work if "he can still perform the essential functions of his job." Reviewing a grant of summary judgment, the appellate court there concluded questions of fact existed as to whether a terminated employee, who had a mental disability, still could perform the essential functions of his job when there was evidence he got his work done despite falling asleep at his desk at times "when he had nothing to do[,] and his medication made him drowsy." (*Id.* at pp. 1191, 1195.)

*Overton* is distinguishable. Not only did the court view the evidence in the light most favorable to the employee, but the employee apparently was sleeping *when he had no work to do.* In contrast, the record shows Snoeck fell asleep at his cubicle on the sales floor when he was supposed to be making sales calls. Viewing the evidence in the light most favorable to ExakTime, we conclude substantial evidence supports a finding that Snoeck could not perform the essential functions of his job— e.g., following up on leads by making calls to prospective clients to sell them on the benefits of ExakTime's software—if he was falling asleep throughout the day. The evidence certainly does not compel a finding that Snoeck was able to perform his essential job duties if he was chronically falling asleep when he was supposed to be doing those duties.

ii. The record supports the jury's implied finding Snoeck did not demonstrate it was likely he would be able to stay awake at work by January

We also conclude the evidence, viewed in the light most favorable to the verdict, did not compel the jury to find it reasonably likely that a leave extended until January 2018 would have allowed Snoeck to return to work able to stay awake and do his job. The record shows that, as of his September 11, 2017 request for an extended leave, Snoeck still did not have his sleep apnea under control to prevent falling asleep on the job.

Prisco testified sleep apnea is "a weight-sensitive disease in the sense that people who go through bariatric surgery and . . . lose a lot of weight" may not have sleep apnea anymore or may see a reduction in its severity. But, he said the "main therapy" for sleep apnea is to wear a CPAP or BiPAP mask.

Downs's and Prisco's notes showed Snoeck had had difficulty wearing his mask since it was prescribed in 2014. In August 2017—even after having the settings adjusted— Snoeck told Dickran he continued to find it "kinda hard wearing a mask to bed." And, on September 11, 2017—when he sent his doctor's note putting him off work through January 1, 2018— Snoeck informed ExakTime that, while he now could sleep five or six hours a night, he "still [had a] ways to go."

Moreover, as of October 2017—after his termination— Snoeck still was not wearing his sleep mask " 'the whole night through.' " He testified, " 'It was still on and off because it was uncomfortable. . . . I still had sleep apnea, or signs of it.' "

33

That month he fell when he dozed off while standing—as he had done in the shower before his leave.[19]

And, in February 2018, according to Prisco's notes, Snoeck was getting the same five hours of sleep a night as he had been five months earlier. Snoeck never testified he would have been able to stay awake had he returned to work in January. Rather, he agreed it was around April 2018 when he got his sleep apnea under control. By October 2018, more than year after he was fired, Prisco noted Snoeck was getting seven hours of sleep; he agreed Snoeck's improvement was due to his nightly use of his BiPAP machine.

Although the jury heard evidence that weight loss could help alleviate the severity of Snoeck's sleep apnea, the evidence also demonstrated the consistent, nightly wearing of his sleep mask to enable him to get restful sleep was the key to the treatment of his condition. The jury thus could have reasonably inferred Snoeck's continued struggle with using his mask throughout the night meant he also would continue to have trouble staying awake on the job—even if he had had bariatric surgery and recovered from it by January 2, 2018. Indeed, the jury heard evidence that, in the end, Snoeck resolved his sleep issues not through surgery, but by consistently wearing his mask.

Snoeck contends O'Hara's assumption that he had not lost and would not lose enough weight to have the bariatric surgery showed he treated Snoeck's obesity as preventing him from sleeping and working. He essentially argues O'Hara mistakenly

---

[19]     Downs extended Snoeck's time off through March 31, 2018, well past his estimated January 2, 2018 return date.

assumed he would not be able to do his job in January due to his weight and, thus, ExakTime violated FEHA when it fired him. (See *Wallace, supra*, 245 Cal.App.4th at pp. 115, 126–127.) But, O'Hara also testified, "[i]t was never about weight. . . . If he was able to come back and do the job and stay awake, that's all I cared about." O'Hara "could have taken [Snoeck] back." It was for the jury to consider and resolve any inconsistencies in O'Hara's testimony. We must accept any part of it that supports the judgment. (*Minnegren, supra*, 4 Cal.App.5th at pp. 513–514.)

     iii. Substantial evidence also supports a finding that Snoeck wanted an indefinite leave

   The jury alternatively could have reasonably inferred from substantial evidence that Snoeck in effect was asking ExakTime to hold his job open indefinitely. " 'Reasonable accommodation does not require the employer to wait indefinitely for an employee's medical condition to be corrected.' " (*Hansen, supra*, 74 Cal.App.4th at pp. 226–227.)

   Snoeck described the purpose for his requested additional time off as, not just to have surgery, but to give him "the time needed to make a complete successful lifestyle change." When asked how long he thought ExakTime " 'was supposed to wait until [he] changed [his] lifestyle before [he] came back,' " Snoeck responded, " 'As long as that time [*sic*] that I needed—until I was healthy[,] and I was ready to come back.' " The jury could infer—as ExakTime's counsel argued in his closing—Snoeck had changed the basis for his leave from getting treatment to enable him to stay awake at work to undergoing a lifestyle change to help him achieve a generally healthier life, however long that might take.

O'Hara's and Snoeck's testimony supports such an inference. O'Hara testified he did not want to extend Snoeck's leave until January because he "wasn't certain when [Snoeck] was coming back and when his lifestyle change would be complete." He continued, "I just didn't know what it meant, what lifestyle change." Snoeck in turn testified the steps he was taking to make his "lifestyle change" included " 'just eating better, working out, taking walks, just being more active and trying to lose weight.' " Those steps relate to getting healthy generally, not improving sleep apnea. General health is not an identifiable physical condition that FEHA protects.

Snoeck testified his instructors in his bariatric surgery classes referred to the surgery as a "lifestyle change" because patients' stomachs are smaller post-surgery, affecting how much they can eat. The jury nevertheless could have interpreted Snoeck's reference to a "lifestyle change" not simply as parroting terminology he heard, but as an indication—in light of his other testimony—that he expected ExakTime to hold his job open until he achieved, as he wrote, a "complete successful lifestyle change."

In sum, viewing the entire record, we presume the jury found Snoeck's evidence "lack[ed] sufficient weight and credibility to carry [his] burden of proof" (*Bookout, supra*, 186 Cal.App.4th at p. 1486) that he would be able to perform his job if given leave until January and/or that the leave he requested was reasonable and finite.

iv.    ExakTime's undue hardship defense

ExakTime also argued that extending Snoeck's leave until January would pose an undue hardship on its business operation. Because we conclude the evidence did not compel the jury to find ExakTime liable for disability discrimination or a failure to

36

accommodate, we need not consider whether substantial evidence supported ExakTime's hardship defense. (*Wilson, supra,* 169 Cal.App.4th at p. 1193.)[20]

         v.     Substantial evidence supports the defense verdict on Snoeck's retaliation and derivative claims

To establish his retaliation claim, Snoeck had to prove that his "requesting or taking a leave of absence as an accommodation of his physical condition was a substantial motivating reason for ExakTime['s] decision to discharge [him]." (See CACI No. 2505; *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042.) The same evidence that supports the jury's finding that ExakTime discharged Snoeck because he was not reasonably likely to be able to return to work and perform his essential job functions in January, and/or that he really was asking ExakTime to hold his job open indefinitely, supports the jury's verdict finding ExakTime did not discharge Snoeck because he took leave or asked for additional leave per se.

Similarly, because they were based on the same evidence and legal theories under FEHA, substantial evidence also

---

[20]    For the same reasons, we need not, and do not, address whether the court erred in excluding evidence of ExakTime's financial condition or in refusing to give Snoeck's proposed jury instruction 13. (E.g., *McCloud v. Roy Riegels Chemicals* (1971) 20 Cal.App.3d 928, 935–936 ["Where several counts or issues are tried, a general verdict will not be disturbed by an appellate court if a single one of such counts or issues is supported by substantial evidence and is unaffected by error, although another is also submitted to the jury without any evidence to support it and with instructions inviting a verdict upon it."].)

supports the defense verdict on Snoeck's derivative claims for failure to prevent discrimination and/or retaliation and wrongful termination in violation of public policy. (See *Scotch, supra*, 173 Cal.App.4th at p. 1021 [claim for failure to prevent discrimination under FEHA dependent upon claim of actual discrimination]; *Hanson, supra*, 74 Cal.App.4th at p. 229 ["because [employee's] FEHA claim fails, his claim for wrongful termination in violation of public policy fails"].)

Finally, as ExakTime notes, Snoeck presented no argument on—and thus has forfeited appellate review of—the jury's finding that ExakTime did not act with malice, oppression, or fraud in failing to engage in the interactive process. (*Telish v. State Personnel Bd.* (2015) 234 Cal.App.4th 1479, 1487, fn. 4.)

## 4. Snoeck has failed to show structural error

Snoeck contends he was denied a fair hearing "because the trial court's arbitrary time limitation prevented him from putting on his damages case." After receiving Snoeck's trial estimate of 10 days and ExakTime's estimate of three to five days, the court advised the parties at the case management conference that, in its experience, a trial like this could be completed in five days. It limited the parties to 6.5 hours each to present their evidence. At the end of the third day of trial, the court gave each side another hour, for a total of 7.5 hours. Later, the court also allowed Snoeck to cross-examine ExakTime's two experts for five minutes each.

We review the trial court's imposition of time limits on the parties' presentation of evidence for abuse of discretion. *(California Crane School, Inc. v. National Com. for Certification of Crane Operators* (2014) 226 Cal.App.4th 12, 22–23 (*Crane*).) A trial court has the inherent authority and responsibility to

administer the judicial proceedings before it fairly and efficiently, and to expedite proceedings to avoid an unduly prolonged trial. (*Id.* at p. 22.)  This authority includes the ability to set reasonable time limits on the presentation of evidence as long as those limits are "mindful that each party is entitled to a full and fair opportunity to present its case." (*Id.* at p. 21.)  Nevertheless, "the court must permit a party to have his day in court.  Denying a party the right to testify or offer evidence deprives him of a fair trial and constitutes reversible error." (*Id.* at pp. 22–23.)

Snoeck argues he had to "speed-read" deposition testimony of ExakTime employees into the record rather than call them as live witnesses, rush his own testimony, rush and limit his wife's and his emotional distress expert's testimony, forgo cross-examining an ExakTime employee—who testified about both Snoeck's sleeping and reallocating his leads during his leave—and limit his cross-examination of ExakTime's experts to five minutes each.  He also was unable to rebut ExakTime's reading of his deposition testimony into the record.

The court did not abuse its discretion in setting the initial 6.5-hour time limit—that it extended to 7.5 hours.  First, Snoeck was well aware before trial that he would have 6.5 hours to present his evidence.  When Snoeck's counsel asked, in the middle of trial, if the court was limiting him to his remaining 1.8 hours to put on the rest of his case, the court answered: "That is correct.  That's exactly what I told you prior to trial. I told you that at the first and final status conference, at the second, perhaps at the third . . . since the beginning of trial." Snoeck was not caught by surprise.  Second, the time limit was not unreasonable or arbitrary.  Based on what we can glean from the record, the court set the time limit after it considered

the parties' trial estimates, Snoeck's objection, the number of witnesses, the court's schedule, the legal and factual issues, and the court's experience with trying similar cases. (*Crane, supra*, 226 Cal.App.4th at p. 20.) The court reiterated the reasonableness of its time limit in the middle of trial. After Snoeck's counsel objected that he had been "arbitrarily limited," given the specific facts of this case, the court responded: "You're not arbitrarily limited. You had a five-day jury trial. . . . [¶] I have looked at the particular facts. I'm aware of this. . . . I have 52 pages of notes in this case from a number of hearings we've had. So I'm certainly aware of this case."

Finally, any purported inability on Snoeck's part to prove damages and liability for punitive damages was due to trial counsel's tactics, as evident from the court's admonishment of Snoeck's counsel: "You understood when we started the trial how long each side had. . . . You have a tendency to ask [the ExakTime witnesses] the same question three and four times to get them to repeat their answer over and over again. If you want to spend an hour getting 20 minutes of testimony, you're allowed to do that, but that's still spending an hour." The court continued, "You chose how to do your trial, which witnesses you plan to call and how long you want to spend on each witness. If you think it's effective to ask the witness the same question several times, that's perfectly fine. . . . [¶] That's your strategy and tactics."

While Snoeck's counsel did have to rush through testimony at times, he concedes he "could have better distributed the time provided." Moreover, the court did not stop Snoeck from cross-examining any witnesses. His counsel *chose* not to do so because he had only three-tenths of an hour left of his 7.5 hours

to question an expert to establish Snoeck's emotional distress damages. And, the court apparently gave Snoeck additional time, albeit limited, to cross-examine ExakTime's experts after his 7.5 hours had expired.

Finally, Snoeck has not demonstrated how he was prejudiced by the time limit other than vaguely to state he could not prove his damages or ExakTime's liability for punitive damages. He does not explain how the verdict would have been different if he had more time to, say, cross-examine the ExakTime employee, or present other evidence he has not identified. Indeed, in the one case Snoeck cites, *Graham v. Graham* (1959) 174 Cal.App.2d 678, 684–685, 688, the court concluded any error in precluding the plaintiff from cross-examining her ex-husband in a family law case did not result in a miscarriage of justice. Snoeck has failed to show an abuse of discretion much less reversible error.

## 5. *The trial court did not prejudicially err in instructing the jury*

Upon request, a party is entitled to correct, nonargumentative instructions on every theory of his case that substantial evidence supports. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 (*Soule*).) Nevertheless, " '[i]nstructions should state rules of law in general terms and should not be calculated to amount to an argument to the jury in the guise of a statement of law. [Citations.] Moreover, it is error to give, and proper to refuse, instructions that unduly overemphasize issues, theories or defenses either by repetition or singling them out or making them unduly prominent although the instruction may be a legal proposition.' " (*Red Mountain, LLC v. Fallbrook Public Utility Dist.* (2006) 143 Cal.App.4th 333, 359 (*Red Mountain*).)

A court also "may refuse a proposed instruction that incorrectly states the law or is argumentative, misleading, or incomplete." (*Alamo v. Practice Management Information Corp.* (2013) 219 Cal.App.4th 466, 475 (*Alamo*).) "Finally, '[e]rror cannot be predicated on the trial court's refusal to give a requested instruction if the subject matter is substantially covered by the instructions given.' " (*Red Mountain, supra*, 143 Cal.App.4th at p. 360; *Alamo*, at p. 475.)

We independently review claims of instructional error. (*Orichian v. BMW of North America, LLC* (2014) 226 Cal.App.4th 1322, 1333; *Alamo, supra,* 219 Cal.App.4th at p. 475.) When the appellant contends the court erred by failing to give a requested instruction, we review the record in the light most favorable to the requesting party to determine whether substantial evidence warrants the instruction. (*Alamo*, at pp. 475–476.) When an instruction is erroneous, "we assume the jury might have believed the evidence favorable to the appellant and rendered a verdict in appellant's favor on those issues as to which it was misdirected." (*Mize-Kurzman v. Marin Community College Dist.* (2012) 202 Cal.App.4th 832, 846 (*Mize-Kurzman*).)

The failure to instruct a jury properly in a civil case is not inherently prejudicial, however. (*Soule, supra*, 8 Cal.4th at p. 580; *Mize–Kurzman, supra,* 202 Cal.App.4th at p. 846.) Thus, we will not reverse a judgment for instructional error unless we conclude—after examining " 'the entire cause, including the evidence' "—it is reasonably probable the party challenging the ruling would have obtained a more favorable result had the instruction been given. (*Soule,* at pp. 570, 580; *Alamo, supra,* 219 Cal.App.4th at pp. 475–476.) The determination of prejudice depends on the nature of the error in the context of the trial

42

record, including, to the extent relevant, the degree of conflict in the evidence on critical issues; the effect of other instructions; the arguments of counsel; any indications by the jury itself that it was misled; and the closeness of the verdict.[21] (*Soule,* at pp. 570–571, 580–581.)

a. *Claimed erroneous instructions*

Snoeck contends the court committed prejudicial error by giving the jury CACI instructions Nos. 2512 and 2513, as modified by ExakTime. " ' "[A]n instruction is erroneous if, though *abstractly correct* as a statement of law, it is not within the issues developed by the evidence or reasonable inferences therefrom.  And if it is likely to mislead the jury the error is prejudicial." ' " (*Veronese v. Lucasfilm Ltd.* (2012) 212 Cal.App.4th 1, 25 (*Veronese*).)

i. CACI No. 2512

The trial court followed CACI No. 2512 to instruct the jury, in part:  "Snoeck claims that he was unlawfully discharged because he was disabled.  ExakTime . . . claims that . . . Snoeck was discharged because of his inability to perform his job which is a lawful reason. [¶] . . . [¶] If you find . . . Snoeck's inability to perform his job was also a substantial motivating reason [for his discharge], then you must determine whether the defendant has proven that it would have discharged . . . Snoeck anyway at that time based on his inability to perform his job even if it had not also been substantially motivated by disability discrimination."

---

[21]  Here, the closest the verdict got was 10 to two, and the jury did not ask any questions or otherwise indicate it had been misled.

The use note for CACI No. 2512 explains this instruction should be used in a "mixed-motive" case: where there is evidence the employer took adverse action against the plaintiff for a "prohibited reason," but there also is sufficient evidence for the jury to find the employer "had a legitimate reason for the action." Our Supreme Court has explained, "[U]nder the FEHA, when a jury finds that unlawful discrimination was a substantial factor motivating a termination of employment, and when the employer proves it would have made the same decision absent such a discrimination, a court may not award damages, backpay, or an order of reinstatement. But the employer does not escape liability. . . . [T]he plaintiff in this circumstance could still be awarded, where appropriate, declaratory relief or injunctive relief . . . [and] may be eligible for reasonable attorney's fees and costs." (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 211 (*Harris*).)

To prevail on his disability discrimination (and failure to accommodate) claim, Snoeck had to prove his ability to perform the essential functions of his job with a reasonable accommodation. Thus, as ExakTime argues, if Snoeck was unable to perform his job with reasonable accommodation, ExakTime did not violate FEHA when it discharged him. But, this was not a mixed-motive case. As Snoeck argues, his inability to do his job is a direct result of his disability. ExakTime did not argue or present evidence that it had another legitimate reason in September 2017—*unrelated* to Snoeck's disability—for which it would have fired him anyway had it not also been motivated by a discriminatory reason.

Rather, ExakTime presented evidence from which the jury could (and presumably did) find that its discharge of Snoeck

44

(due to his disability) was *not impermissible* under FEHA because he could not perform his essential job functions with reasonable accommodation, or because the accommodation he requested was unreasonable. (See *Wallace, supra,* 245 Cal.App.4th at p. 126 [explaining FEHA "recognizes that employers have legitimate reasons for discriminating against disabled persons (i.e., treating them differently)," including when an employee cannot perform his essential job duties even with reasonable accommodation].) Because ExakTime did not present evidence it had a legitimate reason, unrelated to Snoeck's disability, to fire him at the time (*Harris, supra*, 56 Cal.4th at p. 224 [employer must show it would have made the same employment decision in the absence of any discrimination "*at the time it made its actual decision*"]), CACI No. 2512 did not apply; it was error to give it.

Nevertheless, we conclude the instruction did not mislead the jury, nor is it reasonably probable the jury would have found in Snoeck's favor on his discrimination and retaliation claims had the court not given the instruction. The court properly instructed the jury that, if Snoeck proved he was able to perform the essential functions of his job with a reasonable accommodation, he could establish his disability discrimination claim. Snoeck argues CACI No. 2512 referred only to his inability to perform his job, not an inability to perform it even with a reasonable accommodation. Presuming the jury followed the court's instructions—as we must (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 803)—it would have understood Snoeck had to demonstrate only that he was able to perform his job *with a reasonable accommodation*, even after having heard

45

CACI No. 2512. Thus, the jury would have considered the same evidence had the court not given the instruction.

Moreover, because CACI No. 2512 did not apply to Snoeck's failure to accommodate claim, it follows that CACI No. 2512 could not have misled the jury in its assessment of the evidence of Snoeck's ability to perform his job *with a reasonable accommodation* for purposes of that claim. We therefore conclude it is not probable that, had the court not given CACI No. 2512, the jury would have found in Snoeck's favor on his disability discrimination claim, given it presumably determined Snoeck could not perform his job with reasonable accommodation when it found he did not meet his burden to prove his failure to accommodate claim.

Nor is it reasonably probable the jury would have found ExakTime fired Snoeck in retaliation for having taken or asked to take leave, as opposed to his inability to perform his job with a reasonable accommodation, for the same reasons. Nor did CACI No. 2512 mention retaliation.

        ii.     CACI No. 2513

Snoeck also contends the court's instruction with CACI No. 2513 was prejudicial. CACI No. 2513 provides, "In California, employment is presumed to be 'at will.' That means that an employer may discharge an employee for no reason, or for a good, bad, mistaken, unwise, or even unfair reason, as long as its action is not for a discriminatory/retaliatory reason." This is an accurate statement of the law. ExakTime did not offer a non-disability-related reason for firing Snoeck that would fall within its business judgment. Thus, this "business judgment" instruction was not mandatory here,

46

as ExakTime asserts.[22]  (See *Veronese, supra,* 212 Cal.App.4th at p. 20, cited by ExakTime [court prejudicially erred in refusing to give instruction that employer could not be found to have discriminated or retaliated against plaintiff based on jury's belief employer made a wrong or unfair decision or error in business judgment; its decision had to be motivated by discrimination or retaliation related to plaintiff's pregnancy].)

Snoeck argues CACI No. 2513 misled the jury because it allowed it to find in favor of ExakTime on Snoeck's discrimination and retaliation claims even if it found O'Hara mistakenly assumed Snoeck could not perform his job with reasonable accommodation, relying on *Wallace*.  In *Wallace*, the county-employer asserted that, because a disabled deputy sheriff could not safely perform the essential job duties with or without reasonable accommodation, it had a legitimate reason under FEHA for placing him on a leave of absence. (*Wallace, supra*, 245 Cal.App.4th at p. 133.)  The jury there, however, specifically found by special verdict that the deputy *could perform* his essential job functions safely, with or without a reasonable accommodation. (*Id.* at pp. 115–116.)  The Court of Appeal thus concluded the deputy had established the county's liability for disability discrimination because his physical condition "was

_____

[22]     The court also instructed the jury:  "After you have decided what the facts are, you may find that some instructions do not apply.  In that case, follow the instructions that do apply and use them together with the facts to reach your verdict."  The jury thus could have found CACI No. 2513 inapplicable after considering the evidence.

47

a substantial motivating reason" for the county's "decision to place [him] on leave." (*Id.* at pp. 116, 134.)

Here, of course, the jury did not find Snoeck could perform the essential functions of his job with a reasonable accommodation—a necessary element to his disability discrimination claim. *Wallace*'s reasoning thus does not apply. Moreover, CACI No. 2513 specifically states that an employer's reason for discharging an employee cannot be a discriminatory or a retaliatory one. If the jury followed the instruction, it would understand a mistaken reason that was discriminatory would not constitute a lawful action under CACI No. 2513.

Finally, the court instructed the jury that Snoeck did not have to prove ExakTime "held any ill will or animosity toward him personally because he was or was perceived to be disabled." Accordingly, had the jury found Snoeck proved he could perform his job if granted a leave until January 2018, the CACI Nos. 2512 and 2513 instructions would not have misled it to find in favor of ExakTime simply because it found ExakTime held no animosity or ill will against Snoeck, as he seems to argue.

b. *The trial court's refusal to give Snoeck's proposed instructions*

Snoeck contends the trial court prejudicially erred by refusing to give his proposed special jury instructions 1, 4, 6, 11, 13, 15, and BAJI No. 12.13.[23]

i. Snoeck's proposed special instruction 4

Snoeck's proposed special instruction number 4 stated: "Terminating an employee, or taking other adverse employment action, for needing time off or other conduct that results from

---

[23] As we noted, we do not address proposed instruction 13.

a disability is equivalent to terminating an employee based on the disability itself because conduct resulting from a disability is considered to be part of the disability." Snoeck contends the court's refusal to give this instruction "excused ExakTime from its obligations under FEHA to not discriminate against an employee *for symptoms* of a disability, and for time off to have surgery to treat his disability . . . ." We find no error.

Snoeck relies on *Gambini v. Total Renal Care, Inc.* (9th Cir. 2007) 486 F.3d 1087, 1093 (*Gambini*), arguing the Ninth Circuit found the trial court's failure to give an instruction with "almost identical language" required reversal where an employee claimed her disability of bipolar disorder caused her outburst at work that led to her discharge. The employer fired her after its investigation into the outburst while she was on an FMLA leave (*id.* at p. 1092), and the employee unsuccessfully sued under the FMLA and Washington law.

The Ninth Circuit concluded the trial court prejudicially erred when it refused to instruct the jury, "Conduct resulting from a disability is part of the disability and not a separate basis for termination." (*Gambini, supra*, 486 F.3d at p. 1093.) It noted the Washington Supreme Court had adopted a rule drawn from the Ninth Circuit's holding in *Humphrey v. Memorial Hospitals Ass'n* (9th Cir. 2001) 239 F.3d 1128, 1139–1140 (*Humphrey*), that " 'conduct resulting from a disability is considered part of the disability, rather than a separate basis for termination.' "[24]

---

[24] *Humphrey* involved an appeal from summary judgment under both the ADA and FEHA. (*Humphrey, supra*, 239 F.3d at p. 1133 & fn. 6.) Washington's anti-discrimination law is similar

49

(*Gambini*, at p. 1093.) The court explained, "[a]s a practical result of that rule, where an employee demonstrates a causal link between the disability-produced conduct and the termination, a jury must be instructed that it may find that the employee was terminated on the impermissible basis of her disability." (*Ibid.*)

*Gambini* is inapposite. First, the instruction there was not the same as what Snoeck proposed.[25] Second, the facts that necessitated the instruction in *Gambini* are not present here. There, the employer *knew* about the employee's disability *before* her outburst—she told her supervisors about it and asked for accommodations for it. (*Gambini, supra*, 486 F.3d at pp. 1091–1092.) The question was whether her outburst was a symptom of that disability, precluding her employer from using it as an independent reason to fire her. Here, ExakTime did not argue Snoeck's sleeping on the job was *not* caused by his sleep apnea or unrelated to it. Rather, ExakTime argued and presented substantial evidence that, at the time it offered Snoeck leave, it knew of his symptoms—falling asleep on the job—but did not know they were caused by a physical disability (or regard Snoeck as if he had a disability). As FEHA only precludes an employer from taking an adverse action against an employee with a *known*

---

to FEHA. (See *Prilliman, supra*, 53 Cal.App.4th at pp. 949–950 & fn. 3 [acknowledging similarity].)

[25] Snoeck's proposed instruction is an edited snippet from an unreported Ninth Circuit summary judgment case, *Villalobos v. TWC Administration LLC* (9th Cir. 2017) 720 Fed.Appx. 839, 841. While unpublished federal district court opinions are citable, they do not constitute binding authority. (*Markow v. Rosner* (2016) 3 Cal.App.5th 1027, 1043, fn. 8.)

disability, Snoeck's proposed instruction would not have made a difference to the jury finding ExakTime did not violate FEHA when it put Snoeck on leave.

Other instructions also adequately covered Snoeck's theories of his case. The court instructed the jury with CACI No. 2542 that a reasonable accommodation may include extending a leave of absence after FMLA leave has expired— which is what Snoeck proposed. And, under CACI No. 2540, if Snoeck proved the other required elements, he could establish his disability discrimination claim if he demonstrated he would have been able to perform his essential job duties with reasonable accommodation, i.e., after a finite leave of absence. When considering the evidence in light of the instructions given, the jury could not have been misled to find it permissible for ExakTime to fire Snoeck in September simply because he had slept on the job before he took his leave, as Snoeck seems to contend.

We do not disagree with Snoeck's premise that terminating an employee because of the employee's disability-produced symptoms or conduct can constitute impermissible disability discrimination. (See *Soria, supra,* 5 Cal.App.5th at pp. 595–596 [relying on *Humphrey* and finding questions of fact existed as to whether employee was improperly terminated where the reason for her termination—absenteeism—"intertwin[ed]" with her disability—being absent or late for medical appointments relating to her disability].) But, again, the jury permissibly could conclude ExakTime did not violate FEHA if it found ExakTime fired Snoeck because he would be unable to perform his job— due to sleeping—with a reasonable accommodation or if the accommodation he requested was not reasonable.

51

ii.    Snoeck's proposed instruction 11

Snoeck's proposed special instruction number 11 provided: "An employer's honest but mistaken belief in allegedly legitimate reasons for an adverse employment action may not be used by the employer to excuse an adverse employment action taken against an employee disabled or perceived as disabled under FEHA." The instruction is an inaccurate statement of the law, as Snoeck seems to concede.

An employer *may* take an adverse action that it believes is warranted against a disabled employee—even if that belief is mistaken—as long as the employer's reason is not a discriminatory one, e.g., because of the employee's disability. *Wallace*—the source of Snoeck's special instruction—held that an employer cannot escape liability under FEHA for disability discrimination on the ground it honestly but mistakenly believed an employee's disability rendered him unable to perform the essential functions of his job, even with an accommodation. (*Wallace, supra*, 245 Cal.App.4th at pp. 115–116, 122, 126–127, 133–134.)  Moreover, the subject of Snoeck's proposed instruction number 11 was substantially covered by other instructions.

iii.    Snoeck's proposed special instruction 6
and BAJI No. 12.13

Snoeck's proposed special instruction number 6 stated, "An employee's obesity is an actual or perceived disability when an employer regards the employee's obesity as either: (1) a condition that has no present disabling effect but may become an actual physical disability; or (2) a condition that makes achievement of a major life activity difficult."  Snoeck's BAJI No. 12.13 instruction provided the definition of physical disability set forth in section 12926, subdivision (m).

We first note Snoeck's special instruction is an inaccurate statement of the law. The source for Snoeck's special instruction —*Cornell*—clearly explained that, for an employee's obesity to constitute an *actual*—as opposed to a perceived—disability, it must have a physiological cause. (*Cornell, supra*, 18 Cal.App.5th at pp. 928–929.) On the other hand, a perceived disability needs no physiological cause. (*Id.* at p. 939.) Snoeck's instruction incorrectly states obesity is *either* an actual or perceived disability based on the same parameters.

Snoeck argues both his special instruction and BAJI No. 12.13 were necessary because none of the instructions the court gave provided a definition of "physical disability" or helped the jury understand Snoeck's theory that ExakTime regarded his obesity as a disability preventing him from returning to work because it affected his sleep problems. We disagree.

CACI No. 2540 instructed the jury on what Snoeck had to prove to demonstrate ExakTime discriminated against him based on an actual disability or what it perceived to be a disability. The instruction stated Snoeck had to show ExakTime knew he had "a physical condition that limited a major life activity"—an actual disability—*or* ExakTime "regarded or treated . . . Snoeck as if he had[ ] a physical condition that limited a major life activity"—a perceived disability. BAJI No. 12.13 duplicated these concepts with unnecessary details from the statute. And, based on the instruction given, the jury could find Snoeck's obesity was a perceived disability if it found ExakTime treated it as a physical condition that limited a major life activity. An additional instruction focusing on the disability of obesity was unnecessary. Moreover, as Snoeck also predicated his claims on having an actual disability—sleep apnea—his proposed

instruction about obesity would have put undue emphasis on his argument that ExakTime regarded him as disabled based on his weight.

Snoeck also contends his proposed special instruction number 6 and BAJI No. 12.13 were necessary because CACI No. 2540 did not include having "a record of disability"[26] or "future potential for disability" within its definition of physical disability. He argues the jury "had a right to know" about these definitions, asserting O'Hara testified "he was concerned based on what he observed in the past that the future would include the same sleep issues" if Snoeck did not lose weight. We do not agree. O'Hara testified he did not believe Snoeck would lose enough weight to have the bariatric surgery—surgery Snoeck himself "tied" to helping his sleeping issue—and he was concerned Snoeck would continue to have an issue with sleeping on the job. O'Hara's comments do not demonstrate he viewed Snoeck's obesity as a condition with "no present disabling effect" that "may become a[n] [actual] physical disability," as provided in BAJI No. 12.13. CACI No. 2540 amply covered Snoeck's theory about his actual and perceived disabilities.

There was no error in refusing those instructions. But, even if the court should have given an instruction specific to obesity, because ExakTime's alleged treatment of or beliefs about Snoeck's obesity fell within the "perceived disability" explanation in CACI No. 2540, it is not reasonably likely the jury would have

---

[26] The reference to having a "record or history" of a condition refers to an actual disability, not a perceived disability. (See BAJI No. 12.13; § 12926, subd. (m)(3).) It would not apply to Snoeck's obesity.

54

reached a different verdict had the court given Snoeck's proposed instruction and/or BAJI No. 12.13.

iv.  Snoeck's proposed special instruction 1

Snoeck's proposed special instruction number 1 provided: "Reasonable accommodation may include holding a job open for an employee on a leave of absence or extending a leave provided by the CFRA, the FMLA, or other leave laws, or an employer's leave plan.  As long as at the time of an employee's termination, there were plausible reasons to believe that the employee's disability could have been accommodated by a leave of absence, an employer is responsible for its failure to offer such a leave."

Again, Snoeck's proposed instruction is not entirely accurate.  An employer is not responsible for a failure to offer a leave of absence (or extend it) if the leave is not a reasonable accommodation, or the employer shows it would pose an undue hardship.  (*Hanson, supra*, 74 Cal.App.4th at pp. 226–227; *Green, supra*, 42 Cal.4th at p. 260.)  Snoeck contends his instruction was necessary to demonstrate his requested extended leave was not in fact indefinite, and there was no reason at the time of his termination to believe it was not likely he would return at the end of the leave.  Like his other requested instructions, the subject of this one was covered by given instructions.

The court instructed the jury under CACI No. 2542 that "[a] reasonable accommodation is a reasonable change to the workplace that allows an employee with a disability to perform the essential duties of the job," and that a reasonable accommodation may include "[p]roviding additional leave of absence when leave of absence under the CFRA/FMLA has expired."  Thus, the jury already would have understood that, had the extended leave Snoeck requested allowed him to

55

perform his essential job duties, it would have been a reasonable accommodation.

The parties agreed to the following separate instruction: "When an employee can work with a reasonable accommodation other than a leave of absence, an employer may not require that the employee take a leave of absence. An employer, however, is not required to provide an indefinite leave of absence as a reasonable accommodation." Snoeck nevertheless contends his special instruction was necessary because the jury otherwise "had no idea what 'indefinite leave' meant in the context of the applicable law." We disagree. In determining whether "the instructions as a whole fully and fairly set forth the applicable law[,] . . . we assume that jurors are intelligent persons capable of understanding and correlating all jury instructions which are given and, where reasonably possible, we interpret the instructions to support the judgment." (*People v. Jo* (2017) 15 Cal.App.5th 1128, 1152.) We can assume the jury understood what "finite" and "infinite" meant and—when reading the instructions together—also understood that extending Snoeck's leave was a reasonable accommodation if he was likely to return to work at its conclusion, ready and able to perform his essential job duties.

v.     Snoeck's proposed special instruction 15

Snoeck's proposed instruction number 15 is taken from the court's explanation in *Scotch, supra,* 173 Cal.App.4th at p. 1013, that the employer's "obligation to engage in the [interactive] process in good faith is continuous." The jury returned a verdict in Snoeck's favor on this cause of action—he could not have been prejudiced by the court's refusal to give the instruction.

Snoeck nevertheless contends the jury likely was misled without the instruction because it did not know ExakTime had a duty to engage with Snoeck in the interactive process at "several points in time from June 2017 through [his] termination." Although he does not directly say so, we understand Snoeck's challenge of the court's refusal to give this instruction—on the claim the jury found he proved—only to relate to his contention the jury should be permitted to re-decide Snoeck's damages and ExakTime's liability for punitive damages "after being presented with the evidence precluded and being properly instructed on the law."

The court gave CACI No. 2546. It does not specifically state ExakTime had an ongoing duty to engage in the interactive process. But, the instruction properly advised the jury at what point or points ExakTime would be required to do so: if ExakTime "by its own observation" determined Snoeck needed a reasonable accommodation, *or* if Snoeck "requested a reasonable accommodation[] for his physical disability so that he would be able to perform the essential job requirements." Based on the evidence, ExakTime's observations and Snoeck's requests occurred at different times—before June 1, in the summer, and in September 2017. The jury could not have been misled by the absence of an additional instruction that ExakTime's duty to participate in the interactive process was an ongoing one should certain conditions occur.[27]

_____

[27] In any event, ExakTime's duty to engage in the interactive process would be ongoing only to the extent Snoeck asked for a different accommodation or if ExakTime became aware an accommodation was failing and additional accommodation was

57

**6.** ***Snoeck has not demonstrated any prejudicial***
***evidentiary error***

We review the trial court's evidentiary rulings for an
abuse of discretion. (*Park v. First American Title Co.* (2011)
201 Cal.App.4th 1418, 1427.) We will not disturb the court's
decision to admit or exclude evidence "except on a showing the
trial court exercised its discretion in an arbitrary, capricious, or
patently absurd manner that resulted in a manifest miscarriage
of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.)

    a.    *The exclusion of Dr. Downs's testimony about*
        *the plausibility Snoeck could work from home*

Snoeck contends the trial court prejudicially abused its
discretion when it sustained ExakTime's speculation objection
to Downs answering the question, "Do you know if it's plausible
that the accommodation of working from home may have allowed
[Snoeck] to continue his sales job while he tried to improve?"

Snoeck argues he laid sufficient foundation for Downs
to answer the question: that Downs was and had been his
primary care physician for years; that Downs answered, "[y]es,"
he "would consider accommodation for [Snoeck's] illness" when
asked hypothetically whether he "would have been willing to
consider potential other accommodations, other than disability
leave," if Snoeck had told him ExakTime had offered other
options; and that the FMLA paperwork Downs signed listed
Snoeck's essential job functions.

---

necessary. (*Scotch, supra*, 173 Cal.App.4th at p. 1013.) The
language in CACI No. 2546 would include those scenarios.

58

We disagree. "[T]he testimony of a witness concerning a particular matter is inadmissible unless he has personal knowledge of the matter." (Evid. Code, § 702, subd. (a).) As the court commented when Snoeck's counsel tried to reframe the question, "[I]t's a fairly obvious question. No, he wouldn't know [what accommodations may have worked] without considering [them]."

Snoeck nevertheless contends Downs could have provided an opinion about whether he could have worked from home, relying on *Nadaf-Rahrov, supra*, 166 Cal.App.4th at p. 966. There, in reversing an order granting summary judgment, the Court of Appeal concluded the employee's physician's declaration that the employee could perform " 'other jobs that did not require the strenuous tasks of a fitter' " such as one that did not require " 'bending, standing, or kneeling' " was admissible to rebut the employer's contention the employee was unable to perform work of any kind. (*Id.* at pp. 965–966.) But, the doctor there averred he always maintained the employee could work, just not as a fitter. (*Id.* at p. 965.) Here, in contrast, Snoeck would be performing the same job. As Downs had not considered any other accommodation for Snoeck at the time, he had no personal knowledge as to whether Snoeck effectively could perform his inside sales job remotely or part-time.

Even if Downs should have been permitted to answer the question, Snoeck has not demonstrated his testimony would have affected the trial's outcome. Snoeck argues Downs's testimony would have allowed the jury to find Snoeck should not have been sent home on unpaid leave because another accommodation "could work." But, again, substantial evidence supports the jury finding ExakTime had no knowledge of Snoeck's disability when

it offered him leave and, thus, had no obligation to accommodate him. (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 443 [employer ordinarily not liable for failing to accommodate disability it didn't know about].) Moreover, Snoeck never asked to be permitted to work at home or for any other accommodation. (See *ibid.* [employee must " 'tender a specific request for a necessary accommodation' "].) Finally, as ExakTime notes, Snoeck has not made an offer of proof about what Downs would have said if permitted to answer the question.

    b.    *The admission of Dr. Hagen's testimony*

    Snoeck moved in limine to prevent June Hagen, Ph.D., ExakTime's vocational rehabilitation expert, from testifying to her opinions about the inadequacy of Snoeck's job search efforts on the ground she based them on an improper legal standard. As a general rule, an employee's recovery in a wrongful termination case is reduced by the amount the employer proves the employee—"with reasonable effort"—could have earned from other employment. (*Parker v. Twentieth Century-Fox Film Corp.* (1970) 3 Cal.3d 176, 181–182.) In his motion, Snoeck cited Hagen's deposition testimony that, in evaluating Snoeck's job search efforts, she did not compare him to the average job seeker, but to one who exercised "the highest level of diligence possible."[28]

---

[28]    At her deposition, Hagen testified the average job seeker spends "[l]ess than 15 hours a week," and Snoeck's efforts were below average—"a couple hours a week." She opined that, "to find a job in an expedient manner," the job seeker "need[s] to do more." She agreed the applicant "should exercise the highest level of diligence possible."

ExakTime argues Snoeck has forfeited his challenge to the court's denial of his motion because he did not secure a ruling from the court on the record, citing *People v. Ramos* (1997) 15 Cal.4th 1133, 1171 (motion in limine may preserve objection for appeal, but party "must secure an express ruling from the court"). In *Ramos*, although the defendant filed a pretrial motion to exclude evidence, and defense counsel had discussed it with the court, counsel did not reassert his objection when the prosecution introduced the evidence at trial. (*Ibid.*)

Here, just before Hagen took the stand, Snoeck's counsel called the court's attention to the motion in limine, which the court had not seen. After a brief meeting with counsel in chambers, Hagen again was called to testify. Unlike counsel in *Ramos*, there were no further objections for Snoeck to make at that point—he had just made them moments before. We can presume the court denied them.

Nevertheless, we agree Snoeck cannot demonstrate prejudice because he could have cross-examined Hagen about her deposition testimony and purportedly holding him to a standard of the "highest level of diligence." He did not.[29] Moreover, the court instructed the jury that, in determining if Snoeck's damages should be reduced by the amount he could have earned from other employment, ExakTime must prove Snoeck "failed to make *reasonable efforts* to seek and retain" substantially similar,

---

[29] Instead, counsel spent much of his cross-examination questioning Hagen about her opinion that Snoeck's resume was not competitive because it had typographical errors, listed "stay-at-home dad" under experience, and had an outdated style.

available employment.  (Italics added.)  We presume the jury followed that instruction.

Snoeck also contends the court erred in overruling his foundation objection to Hagen's opinion that he could have obtained a comparable job in five months.  Snoeck argues Hagen merely reviewed records and relied on government statistics reflecting the total number of jobs by category, average pay, and average duration of unemployment, but not specifically the average time taken by unemployed persons looking for a comparable job.

We find no abuse of discretion.  Hagen reviewed not only statistics from the Bureau of Labor, including the data mentioned, as well as data on available sales representative positions in Snoeck's area with pay comparable to what Snoeck had made, but also Snoeck's deposition, his resume and job search documents, and on-line job postings.  She also contacted some of the employers who had posted jobs.  Accordingly, the court had a rational basis to find there was a sufficient foundation for Hagen to opine Snoeck could have found comparable employment in five months with a "diligent" job search.[30]

c.  *The trial court's exclusion of job search documents*

Finally, Snoeck contends the court arbitrarily precluded him from introducing his applications to noncomparable positions in rebuttal.  ExakTime objected to Snoeck introducing the

---

[30]  Hagen testified "an individual who wants to find a job needs to treat it like a full-time job," but Snoeck spent only two to four hours a week on his job search.  She told her clients to spend five to six hours a day.

62

applications because he had not produced them in discovery. Snoeck responded he had objected to their production, and ExakTime never moved to compel them. He sought to introduce them to rebut ExakTime's insinuation he had applied for only 15 jobs. ExakTime's counsel had asked Snoeck whether an exhibit containing about 15 job applications was "the sum total of [his] efforts to find work." Snoeck answered that he had applied to "a lot of jobs," but those applications were to noncomparable positions and not part of the exhibit.

The court did not permit Snoeck to introduce the "stack" of applications themselves into evidence—because they were not produced in discovery—but did allow him to testify about those applications. Snoeck contends their exclusion was prejudicial because Hagen based her opinion in part on the small number of comparable job applications Snoeck had produced. When asked if her opinion would change if she knew he had applied for 75 to 100 jobs, not just 15 to 20 jobs, Hagen responded she would need to see the applications.

Even if Snoeck's refusal to produce the job applications in discovery did not preclude him from using them at trial, he has failed to show how their exclusion affected the trial's outcome. The court permitted Snoeck to testify he applied for 70 to 100 positions that were not substantially similar to his ExakTime job. He got one of those jobs and held it for a short time. Thus, the jury heard Snoeck applied for many more jobs than the 15 to 20 that were comparable to his old position.

7. **Snoeck's remaining contentions**

Having rejected Snoeck's claims of prejudicial error, we find no cumulative error. We have reviewed ExakTime's (and Snoeck's) closing argument and do not find it created any

prejudice by compounding any purported instructional error or misleading the jury.

**Appeal From Order Taxing Costs**

Snoeck contends the trial court improperly granted ExakTime's motion to tax costs because ExakTime's moving papers did not include admissible evidence of its written 998 offer; the court erred when it permitted ExakTime to submit evidence of its 998 offer belatedly with its reply papers; and the 998 offer was invalid. Because we conclude ExakTime did not meet its burden of proof in its moving papers, and the court abused its discretion in permitting it belatedly to file the 998 offer, we need not address its validity.

1. *Applicable law and standards of review*

The prevailing party in a civil case generally is entitled to recover its costs from its opponent. (*Elite Show Services, Inc. v. Staffpro, Inc.* (2004) 119 Cal.App.4th 263, 268 (*Elite Show*); Code Civ. Proc., § 1032, subd. (b).) When the prevailing party obtains a judgment "less favorable than a pretrial settlement offer made by the other party" under section 998, however, "the prevailing party is precluded from recovering its own postoffer costs." (*Elite Show*, at p. 268; § 998, subd. (c)(1).)

The offering party has "the burden of demonstrating that the offer is a valid one under section 998." By the same token, "a section 998 offer must be strictly construed in favor of the party sought to be subjected to its operation." (*Barella v. Exchange Bank* (2000) 84 Cal.App.4th 793, 799.) To meet the statutory requirements, the offer must be in writing, include a statement of the offer, "the terms and conditions of the judgment or award," and a provision that allows the accepting party to sign a statement that the offer is accepted." (§ 998, subd. (b).) We

64

review the validity of a 998 offer de novo. (*Ignacio v. Caracciolo* (2016) 2 Cal.App.5th 81, 86.)

A losing party who challenges the prevailing party's claimed costs "has the burden to present evidence and prove that the claimed costs are not recoverable." (*Seever v. Copley Press, Inc.* (2006) 141 Cal.App.4th 1550, 1557.) We generally review a cost award for abuse of discretion. (*Id.* at pp. 1556–1557.)

**2.    *ExakTime's motion to tax costs***

After the court entered judgment on the jury's verdict, Snoeck filed a memorandum of costs. ExakTime moved to tax Snoeck's claimed costs incurred after June 4, 2019—the date ExakTime served its 998 offer, which Snoeck rejected.

ExakTime did not include a copy of its 998 offer with its moving papers. Instead, it described the offer in its counsel's declaration, as follows: "[O]n June 4, 2019, my office personally served [a 998 offer] to [Snoeck]. . . . The amount offered was greater than the jury's award of $130,088, and was exclusive of attorneys' fees, which were to be paid by [ExakTime] upon a determination by the Court if the Parties were unable to agree upon a reasonable amount."

Snoeck opposed the motion and contended ExakTime failed to meet its burden to demonstrate it made a valid 998 offer. Snoeck also objected to defense counsel's description of the 998 offer on secondary evidence and inadmissible hearsay grounds.

ExakTime attached a copy of the 998 offer to its counsel's reply declaration, but argued doing so was unnecessary because Snoeck had admitted its existence. The offer substantially provides: ExakTime offers to pay Snoeck $500,000, "which does not include Plaintiff's costs and attorneys' fees incurred, in exchange for a dismissal with prejudice of this entire action,

65

as to all parties, and in satisfaction of all claims for damages, penalties, costs and expenses, and interest in this action. Defendant further offers to pay Plaintiff all reasonable attorneys' fees and costs incurred on behalf of Plaintiff up to the date of this offer . . . subject to a determination by the court upon noticed motion, if the parties cannot agree otherwise." Snoeck filed a request to strike the evidence as improper reply evidence, and made other evidentiary objections.

The court sustained Snoeck's objection to ExakTime's moving declaration describing the 998 offer based on the secondary evidence rule. But, the court overruled Snoeck's objections to ExakTime's reply declaration and attached written 998 offer. The court concluded that, because the $500,000 offer was greater than the $130,088 jury award, Snoeck was not entitled to recover his post-offer costs.

At the hearing, Snoeck's counsel asked for the opportunity to file a brief to respond to the "new" reply evidence and address the 998 offer's purported invalidity. Counsel essentially argued the offer was "self-contradictory" because on the one hand, it purports to offer $500,000 *exclusive* of fees and costs, but then states the $500,000 is offered in satisfaction of all damages, etc., *including* "costs and expenses."

The court rejected counsel's request to file another brief, noting Snoeck had the 998 offer "long before this motion was ever filed." The court thus did not consider the 998 offer "new evidence," and made clear it thought Snoeck's counsel should have addressed his substantive argument about its validity in his opposition, noting he could have attached the 998 offer himself. The court said it thought Snoeck's counsel was "playing games" and adopted as its order his tentative ruling granting the motion.

### 3.    *Analysis*

It is undisputed ExakTime made Snoeck a 998 offer, Snoeck rejected the offer, and the $500,000 that ExakTime offered was greater than the $130,088 the jury awarded him. Nevertheless, Snoeck disputed the validity of the offer on the ground it was ambiguous or self-contradictory.  As ExakTime sought to apply section 998's cost-shifting provisions, it bore the burden to demonstrate the offer met the statutory requirements and was valid.

And, as the party moving to tax Snoeck's costs, ExakTime had the burden to present evidence to prove Snoeck's claimed costs were not recoverable.  That evidence was the rejected 998 offer.  Because "oral testimony is not admissible to prove the content of a writing" (Evid. Code, § 1523), the only way ExakTime could present admissible evidence of its valid 998 offer to tax postoffer costs was to produce a copy of the written 998 offer it served on Snoeck.

Thus, ExakTime cannot seriously dispute its moving papers failed to establish its entitlement under section 998 to tax Snoeck's postoffer costs when it did not attach the written 998 offer, did not state the specific amount of the offer,[31] and only described the general terms of the offer through ExakTime's counsel's inadmissible declaration.  As the court sustained Snoeck's objections to the moving declaration, ExakTime's

---

[31]    Without the specific amount, there would be no way for the court to determine if the judgment, including preoffer costs, was more or less favorable than the 998 offer.  (See Wegner et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2020) ¶ 17:389.)

moving papers failed to prove Snoeck's postoffer costs were unauthorized. The primary question before us then is whether the court erred by considering the belatedly-filed written 998 offer to grant ExakTime's motion. " 'The general rule of motion practice . . . is that new evidence is not permitted with reply papers . . . . "[T]he inclusion of additional evidentiary matter with the reply should only be allowed in the exceptional case . . ." and if permitted, the other party should be given the opportunity to respond.' [Citation.] Whether to accept new evidence with the reply papers is vested in the trial court's sound discretion, and we may reverse the trial court's decision only for a clear abuse of that discretion." (*Carbajal v. CWPSC, Inc.* (2016) 245 Cal.App.4th 227, 241 (*Carbajal*).)

We conclude, in these circumstances, where ExakTime appears to have intentionally held back from its moving papers the evidence necessary to satisfy its burden of proof—and offered no explanation of inadvertence or mistake—the trial court abused its discretion by permitting it to submit the written 998 offer with its reply. As in *Carbajal*, ExakTime did not submit its written 998 offer to respond to a new issue Snoeck raised in his opposition; "rather, it was evidence on an issue [ExakTime] raised, but failed to establish, in its moving papers." (*Carbajal, supra*, 245 Cal.App.4th at p. 241 [noting defendant who moved to compel arbitration and argued the FAA applied "was required to present evidence to support its claim," not wait until the reply].)

We recognize Snoeck had the 998 offer for months before ExakTime filed its motion; it was not a surprise. But, ExakTime bore the burden of proof—it was required to present admissible evidence establishing Snoeck's costs were not recoverable due to its valid 998 offer. Snoeck was not required to respond to

68

evidence ExakTime failed to present regardless of his knowledge about its existence.  Accordingly, we reverse the trial court's order and direct it to enter an order that reinstates the $30,056.44 in costs Snoeck incurred after June 4, 2019.

## DISPOSITION

The judgment is affirmed.  We dismiss ExakTime's cross-appeal.  The order taxing Snoeck's costs is reversed.  The trial court is directed to enter a new order awarding Snoeck costs totaling $79,409.90, the amount he would have received had the court not reduced the cost award by costs he incurred post-June 4, 2019.  The parties are to bear their own costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

We concur:

EDMON, P.J.                                    HILL, J.[*]

---

[*]    Judge of the Santa Barbara County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.